Good morning, Your Honors. This is Gregory Baruch for the Plaintiffs' Appellants. If I may, I'd like to reserve five minutes for rebuttal. You may, but you'll have to help keep track of your own time because the time there is your full time. Thank you, Your Honor. There are four points we would like to make in this case. First, we are only trying to enforce the plain language of California's insurance code, that the business of insurance shall be subject to California's antitrust laws and other laws, and that is part of the rate law, making it very unlikely that there's some implied exemption for rates. Secondly, there is binding precedent in this circuit, the Knevelbard case, which the District Court didn't even mention, that says that businesses in California are subject to antitrust claims even if the fixed prices had been approved as reasonable by a regulatory agency. Third, the only alternative is to find that the insurance companies are completely immune from any antitrust claim relating to rates because the insurance code specifically provides that the insurance commissioner cannot consider competition in assessing rates. So the only possible forum is the courts. Fourth, we believe that the case should be reassigned. In this case, the District Court initially misunderstood the plaintiff's claims, as this Court has found, dismissing the case with prejudice in essentially a one-paragraph decision without addressing other issues, a piecemeal adjudication that has extended the case for four years and increased the burden on this Court. Then when it went back down to the Court, the Court said, I do have trouble with whether or not the plaintiffs can, notwithstanding the Ninth Circuit language, state an antitrust claim, even though the Ninth Circuit had already found it the contrary. The Court then dismissed again, but didn't even address most of the key issues in the case. It did not address Knevelbard, which was binding authority. It did not mention Fogle, which says, particularly in the context of California insurance, that there is no filed rate doctrine in California. And it didn't even mention 1861.05, which is the provision that states that the insurance commissioner cannot consider competition in assessing rates. Those are the points we have to make. And looking more closely at the insurance code, we think the closer you look at the code, the more clear it becomes that the District Court erred here. The insurance code was fundamentally amended by California in 1988 in Proposition 103. Before that, there was a specific provision in the code, 1853, that stated that insurance companies could cooperate in any way with each other about rates. Now, what did Proposition 103 do? It repealed that provision. So instead of that, it enacted the provision that states, the business of insurance shall be subject to the laws of California and specifically mentioned the antitrust laws of California as applicable. It also put that provision into the rate law of California. At the same time, for the first time, California introduced rate filing, and it provided that insurance companies had to file rates for approval. But it set up a limited regime for the insurance commissioner to review rates. The commissioner can look at whether it falls within broad parameters of profitability, but at the same time, the code specifically states that the insurance commissioner cannot look at competition in assessing rates. Now, we believe if you put all that together, repealing the provision that they can cooperate on rates, enacting that the business of insurance is subject to the antitrust laws, putting that in the rate law, and depriving the insurance commissioner of the ability to look at competition in assessing rates, we think the only reasonable conclusion is that the voters of California intended to put review of rates for competition with the courts, the traditional forum. And we think this is made even stronger by two other factors. One is that in California, as elsewhere, exemptions to the antitrust laws are heavily disfavored and strictly construed. Okay. Well, I, for one, I'm just speaking for myself. I'm willing to grant that insurance companies are subject to California's antitrust laws. And I'm willing to grant that an antitrust case that has to do with collusion among insurance companies to restrain trade that has an effect on the rates is not necessarily within the filed rate doctrine because the insurance commissioner doesn't look at that when it's looking at rates. Okay. So if we grant you that. Now, so I can understand how if insurance companies got together and said we are going to together charge higher rates to insurers to fix this price and we're going to make it, we're doing this together that you might be able to have, that you could have an antitrust case. But here they did not, that's not what happened. The claim here has to do with a conspiracy to do something else, not direct rate setting, but something else. And I wish you'd help me understand what the something else is. Yes, Your Honor. In this case, what happened is essentially the insurance companies got together to restrict supply. And I think it's important here to note that price fixing. Restrict supply. The supply of what? The supply of insurance policies, the variety of insurance policies that would be available. An analogy would be if the television manufacturers of America got together and said let's just make black and white sets and not make color sets. It is reasonable to expect that the price of black and white sets would go up, because everyone would want one, because there wouldn't be an alternative. So if you restrict the supply of something, if you cut out the higher quality alternative, you increase the demand for the lower quality alternative, as with television sets. Same with insurance. If you cut out the higher quality insurance, then the lower quality insurance will be in higher demand and you will be able to charge a higher price. And we think to some degree this has been resolved in the First Ninth Circuit decision in this case, which said that we had stated a valid antitrust claim, because if you were to go that far. It didn't go that far. Well, in the sense of pleading that we had pled a traditional antitrust claim. There had been standing established, according to that. Yes, Your Honor. And we do discuss in our brief that courts have routinely said if you restrict supply, it is equivalent to price fixing, that it is treated the same way. So to explain the supply that's been curtailed by agreement, it's the coverage for the OEM parts that seems to be the market we're talking about? Yes. In an unrestrained market, you would have some companies that provided just OEM replacement quality repair. And in fact, that is, as we set forth in our complaint, far preferable to what the insurance companies do now, which is they have parts that are certified as being of like kind and quality by CAPA, but that are really, you know, grossly inferior. But that would be fraud. I'm not seeing how that's an antitrust violation. The collusion is in creating this CAPA that does the certification. Is that right? That is part of it, yes, a large part of it. Well, what they've done is they've increased the information costs and the cost to a competitor who wanted to compete on parts quality. That any competitor who wants to come in and say, don't buy from State Farm, don't buy from Allstate, buy from us because our repairs are high quality and theirs are terrible, will have to face and have faced State Farm and Allstate saying, well, look at CAPA. CAPA is an independent third-party arbiter. It is respected. It is, you know, it's impartial. And they find that these parts are just as good. And what that has done is it has increased the burdens on competitors. So the issue, I might also add. It increases the burdens on competitors because it does what? You're talking about competitors on the auto parts market or on the insurance market? In the insurance market. Okay, why does it increase the pressures on competitors? Because the pressure on competitors is that if they want to fight this, then they have to increase their marketing budget to overwhelm the fact that there's an entire organization out there that's saying that their parts aren't better than the parts that Allstate and State Farm are using. And as a result, you know, they don't have unlimited marketing budgets. The problem is that CAPA is not approving parts that are authorized by other insurance companies? They are approving parts as of like kind and quality that the defendants and other CAPA members use, but that are, in fact, as we plead, grossly inadequate. They're well below what they should be. So that's the ones that the insurance companies you've sued are using, correct? Well, the ones we sued are among the ones that use it. There are others as well who are also competitors. I have to say I'm quite confused by your argument. I thought that the problem was that CAPA was approving substandard auto parts for repairs, and that had the impact of reducing the cost of repairs, which had an impact on the provision of services in the market. No, well, that is not the gravamen of our case. The gravamen of our case is what's set forth in the First Ninth Circuit decision, that they excluded competition in insurance. And the way they did that was by making it much more difficult for anyone to compete on parts quality. The insurance companies could not come in and say, you know, their parts are terrible because of this collusive organization, CAPA, that keeps them from doing it. And I may add, I would also say I appreciate the Court's concerns, but I don't know if there's actually a basis. I guess I don't understand it. I don't understand why that keeps them from saying they're using substandard parts and CAPA is a fraud. Well, what it does is they can use, the competitors can use parts that are better, but they can't, it's much harder for them to show that they're better. It's harder for them to compete. It reduces their incentive to do so, because an insurance company that's looking back saying, how do I enter this market, how do I get ahead, do I do it on parts quality? They're more likely to say, well, if I do it on parts quality, I've got all these insurance companies and CAPA out there saying that I'm wrong. I have to, I'm going to have to spend a lot of money to try and overcome that burden. It then becomes easier for them to try to compete on something else. So like any kind of exclusion in antitrust, it reduces, it increases the cost of entry, in effect, the cost of competing, and discourages competition. I guess I don't understand the difference between that and somebody has a very large advertising campaign that says we use only the top quality ingredients here, and these ingredients are certified by the Association of whatever it is, cereal manufacturers, as being top quality. And somebody comes in and says they're not using top quality ingredients, they're using, it's just a lie, it's a lie. But it increases the advertising budget. What's different here is that there's this purported third-party organization that really isn't a third-party organization, that has been constructed for the purpose of making it harder to compete on parts quality. And in fact, in terms of the plausibility, we do think that the original... Is that the purpose of it, to make it harder to compete, or is the purpose of it to let them use lower-quality parts? Well, I think that if... Make it easier for them to use lower-quality parts. If there were unrestrained competition, it would be very difficult for them to use lower-quality parts, though, because there would be more transparency about the quality of the parts. And... I still don't understand how they're restricting competition in the insurance market. Well, the way they're... By making it much more difficult for people to compete on the quality of parts. And in fact, in terms of the plausibility of the claim, we would submit that this argument was basically resolved in the original Ninth Circuit decision. You know, I'm looking at your second amended complaint. I'm looking at paragraphs 90 and 91. Paragraph 91 says the conspiracy had the effect of raising and maintaining premiums. Yes, Your Honor. Above competitive levels. And I thought that had to do because they were using inferior parts. They were using parts that they were telling you were certified and the equivalent of OEM, but that it were in fact not. And so their premiums were artificially high because they were telling you that they were giving you something that they in fact weren't. It sounds like Judge Schroeder suggested that there might be some fraud there, but that at least sounds to me like it might have some kind of an anti-competitive effect. I don't understand the argument that you're making here today. Well, Your Honor, they would not be able to get away with charging what they do if it weren't for this exclusion of competition created by the creation of CAPA. Because CAPA makes it much more expensive for competitors to make clear what the difference in parts quality is. As a result, it discourages them from competing so that there hasn't been parts quality competition among insurance companies, which enables them to charge more than they otherwise could. But what's the – you were over time, but what's the closest case that you rely on that supports your theory? Well, Your Honor, if I may, on that issue, we briefed that fully in the first – in the first – if I may, I would appreciate the opportunity just to submit a notice of supplemental authority. No, no. It's fully briefed. It's in your briefs in the first appeal? I'm sorry, Your Honor. It's in the briefs in the first appeal, not in this appeal. Okay. Thank you very much, Your Honor. Thank you. May it please the Court. My name is Rick Fenton. I represent Allstate Indemnity Company, and it's my privilege this morning to argue on behalf of all of the defendants. The complaint, the second amended complaint in the district court, does not identify a single competitor that has been excluded from the market. It doesn't identify a single competitor that wasn't able to sell the kinds of insurance policies that it wanted to sell. It doesn't identify a single consumer who went out looking for all OEM policies but found a shortage in the marketplace. This is not a price-fixing case, no matter how many times plaintiffs throw that word around. Nor is it a case of supply restriction, as counsel alluded to just a few moments ago. OPEC engages in supply restrictions. They raise the price of oil by restricting the supply of a product they sell, namely oil. They don't raise the price of oil by restricting the supply of natural gas. But that's essentially plaintiffs' theory here. They are saying that because our clients reserve the right, as they have a right to do under non-OEM parts, that they are somehow restricting the supply of insurance policies that use all OEM parts. And that is preposterous. If I were an insurance company faced with that kind of competitive situation, I would have an advertising campaign advertising my all OEM policies to beat the ban, and there are companies in the state of California that in fact do so. There should not be any mistake about it. Plaintiffs in this action are directly challenging the rates submitted by defendants and approved by the California Commissioner of Insurance. That claim flies in the face of Chapter 9 of the California Insurance Code, which lays out a comprehensive, detailed, and exclusive scheme for the submission, approval, and challenge to insurance rates in the state of California, including review of either submitted or even approved rates at the instance of any consumer, including the plaintiffs here, who think they have been aggrieved by those rates. You're not contending that if a rate is obtained by means of approval, it's obtained by means of fraud, essentially. There's some kind of fraud going on, that that's barred by the approved rate. I don't necessarily agree. You don't have to go that far. No, I wouldn't go that far, Your Honor. But there's nothing in this complaint that alleges any kind of manipulation or improper use of the rate process. There's no allegation in this complaint that suggests that any of the cost information which the insurers supplied to the insurance commissioner was in any way false. And one of the other disconnects in this complaint is that the way that insurance rating is done, if the insurance companies were saving money through the use of non-OEM parts, that would be reflected in their historic loss costs, it would be reflected in their trending, and the impact on rates would be downward, not upward. Plaintiffs in this complaint never explain a plausible theory as to how this supposed anti-competitive impact on rates could possibly occur unless there was some manipulation of the rate process, which they don't allege. Your Honor, insurance code section 1860.1 states specifically that no act done or action taken pursuant to the authority conferred by Chapter 9, which deals with the setting of rates, shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State. And I quote it, any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance. Well, but the antitrust laws do. There is California law that the antitrust laws apply to insurance companies. Oh, and indeed antitrust laws do apply to insurance companies, Your Honor, but in the case that is the province of the insurance commissioner. And I do want to address the plaintiff's claim. Did the insurance commissioner weigh in at any time in this suit? No, Your Honor, and unlike some of the other cases that have been cited in the briefs, there was no exhaustion of administrative remedies here. But the insurance commissioner didn't enter any kind of an appearance or file a letter protecting his own jurisdiction. No, Your Honor, I don't believe that was ever requested by any party. Okay, I guess what I'm trying to understand with respect to what you are saying now, what we held in the first case, because what we said was that they alleged that defendants violated California antitrust law by conspiring to thwart competition over and deceive plaintiffs with respect to repair coverage qualities. Such conspiracy and deception, according to plaintiffs, prevented higher quality coverage from reaching the market and artificially inflated premiums for lower quality coverage. Plaintiffs have standing to pursue such a claim. Now, in your view, is such a claim barred by the file rate? Well, I think it's barred by the insurance code, Your Honor. File rate may be a misnomer. It's analogous to that. As we described it as a claim covered subject to exclusive jurisdiction of the insurance company. Right, and I believe if Your Honor continues reading in that opinion, the Ninth Circuit specifically expressed no opinion as to whether plaintiffs could state a claim or whether it was a claim that was barred by California insurance law, which is our argument. And I do want to deal with the issue that Your Honor raised about application of the antitrust laws. What we're talking about here is a very narrow issue, and that is protection of the insurance commissioner's jurisdiction over rates. If a competitor were to bring an antitrust claim, if one of the companies, unnamed companies, that was supposedly excluded from this market, were to bring an antitrust claim, that would apply. This statute would not be a bar. If OEM manufacturers were to claim some kind of a boycott, this statute would not be a bar. If the attorney general were to bring an action for some kind of prospective injunctive relief, the statute would not be a bar. More to the point, if the plaintiffs here were to file a petition with the exclusion, this statute would not be a bar. But what this statute is a bar to is a collateral attack on rates in the courts, and that is precisely what this action is. Counsel did reference that these plaintiffs are simply policyholders who claim that they paid too high rates. Exactly, Your Honor. None of these policyholders had an accident. The complaint goes on for pages and pages and pages about the supposed deficiencies in non-OEM parts. Not one of these plaintiffs ever had a repair claim. Not one of these plaintiffs ever received any of these supposedly deficient parts. Their only complaint is that they paid a rate that they say should have been lower. If that isn't a direct collateral challenge to rates, I don't know what is. And the case, by a wide margin, that is the closest to this case, is the Walker case, which is discussed extensively in the briefs. And plaintiffs spend a good part of their briefs trying to distinguish Walker. And at the end of the day, the only thing that they can really come up with is that it was not an antitrust case, and indeed it was not. But that is a distinction without a difference. Because Section 1860.03 does not single out the antitrust laws as an exception. What it says is that insurance companies are subject to all of the laws of the State of California, including antitrust laws, including the Unrest Civil Rights Act, including the UCL, all of those laws. And as a general matter, insurers are. But what the Walker court held is that in the context of that case, which did involve a UCL claim, which did involve a fraud claim, which did involve claims for unjust enrichment, that the Chapter 9 of the Insurance Code placed those matters within the exclusive jurisdiction of the insurance commissioner, and a collateral attack was barred. And I would submit that in substance, Walker is indistinguishable from the case at bar. Let me ask you to address this Eleventh Circuit case that both parties cite, Gilchrist. Yes, Your Honor. It seems to be, to me, that that establishes that the business of insurance is rate-making. And so that found, of course, that the Sherman Act didn't apply because of the McCarran-Ferguson Act. But in California, we have the special statute, which deals with, well, the whole apparatus, which deals with rate-making and then has an exception for antitrust and UCL, among other things. Why doesn't that case work the way the plaintiff's counsel has argued in the brief, namely that it points out it precisely allows for this kind of an attack as the plaintiffs have pleaded? Well, counsel and I were both involved in the Gilchrist case, so I think I can answer that, Your Honor. If you read Judge Choflat's opinion in the Gilchrist case, what it said is that this is an attack on rates. He did then address plaintiffs' secondary argument that, well, we're not really aware of the non-rate activity of using these non-OAM parts. And Judge Choflat said basically, well, you know, even if this weren't a direct assault on rates, that would be sufficient to bring it within the ambit of the business of insurance for McCarran-Ferguson purposes. But I think if you read Judge Choflat's opinion, he says flat-out that this is an assault on rates. As a matter of fact, and it may be helpful to this Court, the first question that Judge Choflat asked me when I argued that case was, you know, counsel, if I were the, in that case, Florida Commissioner of Insurance, why would I care what some judge said about my rates? I'm going to charge the rates that I want to charge. And, indeed, the same is true in California. What we've got here, if this kind of a cause of action is cognizable, we will have a bunch of different courts setting a bunch of different rates, the Commissioner of Insurance setting the rates. I'm not sure that that's the case. The Walker case was a case where, I think, where they were trying to get the rates back, that recover too high rates. This is a little more creative. They want something else. I don't agree, Your Honor. I think this is a request. They call it damages. They call it restitutionary disgorgement. The only way that one can look at this is as a rate rebate. What they are saying is, we paid one rate. The rate should have been lower. We are entitled to the difference. They can slap all the labels they want on it, but if I may invoke Shakespeare, a rose by any other name would smell as sweet. This is a request for a rate rebate, and there is no question about that. And that is what Judge Choflat found in the Gilchrist case, which was almost an identical pleading under the federal antitrust laws. That is what Judge Ware found below. And that, I think, is the conclusion that this Court should come to as well. Let me just say one other thing about the pleading here. The complaint, as I mentioned before, gives a very detailed rendition of the supposed problems with non-OEM parts. But that is in stunning contrast to the virtual lack of any allegations about the formation of this so-called conspiracy, the particulars about how this supposed agreement was made. And beyond that, there is a complete disconnect, as we've seen, between plaintiff's allegations that money was saved by using aftermarket parts and the assertion that premiums were inflated as a result. And I think it was amply demonstrated in our brief, that just doesn't parse. And likewise, although plaintiffs say that defendants are excluding competition, again, there's absolutely no identification of any competitor who has been excluded. What plaintiffs have done here, in essence, is taken what would otherwise be a consumer fraud complaint about the supposed quality issues of non-OEM parts. They've slapped a bunch of antitrust labels on it, and they have called it a claim. But there is a complete disconnect economically between the conduct that they are asserting and the effect on the marketplace. And the irony is that use of non-OEM parts is about as pro-competitive an activity as one can have, because without it, the automakers would have a virtual monopoly and did have a virtual monopoly on the sale of replacement parts. And that's what CAPA was designed to address. And my time is up. I thank the Court for its attention. Thank you. Would the Court indulge me with five seconds of rebuttal? Well, I'd like to ask a question. Oh, yes. Thank you, Your Honor. What damages do you want? We ask for antitrust damages. Well, what is that in this case? It would be based on the difference in the rate and what the rate would have been in a competitive market. Okay. And the one thing I wanted to mention was regarding, and I thank the Court, regarding quality competition, how restricting quality competition excludes competition and increases price. We refer the Court to the National Macaroni case and the American Radiator case, both of which are cited on page 39 of our brief. Thank you. Thank you very much, Your Honor. Thank you. The case just argued is submitted for decision. That concludes this portion of today's calendar. And so this Court for this session stands adjourned.
judges: Stotler, Schroeder, Bybee